# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 16-CR-4095-LTS |
| vs. | |
| JOHN CHARLES MCPHERSON, II, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Defendant John McPherson, II, moves to suppress statements he made during a custodial interrogation, arguing that he did not validly waive his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Doc. 42. The government resists the motion, arguing that McPherson had been advised of his rights earlier in the day (after which he invoked the right to counsel) and that McPherson waived those rights by initiating further communication. Doc. 45. Because I find that McPherson neither initiated further communication under *Edwards v. Arizona*, 451 U.S. 477 (1981), nor waived his *Miranda* rights, I recommend **granting** the motion to suppress.

## I. *BACKGROUND*

On the morning of October 20, 2016, McPherson was approached while apparently sleeping inside a vehicle.[1] Def. Ex. B, 02:00. During the encounter, an

---

[1] The facts are taken from the testimony of the officers at the hearing and the admitted exhibits, particularly Government Exhibit 1, a video of the interview room at the Sergeant Bluff Police Department; Government Exhibit 2, a video of the booking room at the Woodbury County Jail; and Defendant Exhibits C and D, the audio recording and transcript of McPherson's interview at the Woodbury County Jail. All times listed are approximate and come from the time stamp on the video (Government Exhibits 1 and 2) or the time on the media player (Defendant Exhibits B and C, which have no time stamps).

officer shot at (and missed) McPherson and thereafter found a firearm in his waistband. McPherson was taken to an interview room at the Sergeant Bluff, Iowa, police department by Woodbury County, Iowa, Sheriff's Deputy Todd Peterson. Upon entering the interview room, McPherson told Deputy Peterson, "I want a lawyer first." Govt. Ex. 1, 9:47:28. Deputy Peterson responded that they were only there to "get [McPherson] more comfortable so [he's] not smashed up in the back of th[e] car." A few minutes later, Deputy Peterson asked McPherson something further about his attorney, although it is unclear what prompted this question.[2] Govt. Ex. 1, 9:56:10. A few minutes after that, McPherson said that he was not going to answer any questions, and Deputy Peterson responded that he was not going to ask any. Govt. Ex. 1, 9:59:05. The pair then discussed whether Deputy Peterson should read McPherson his *Miranda* rights, including whether McPherson was detained or under arrest and whether the distinction mattered. When Deputy Peterson remarked that he did not want McPherson to say something he regretted, McPherson said that he was talking to a lawyer first. Govt. Ex. 1, 10:00:00. Shortly thereafter, McPherson began to sleep. Around thirty minutes later, another officer entered the room and during a brief conversation, Deputy Peterson told the other officer that McPherson had asked for a lawyer twice, that he had not advised him of his *Miranda* rights, and that they had not talked about anything other than passing the time. Govt. Ex. 1, 10:35:40–10:36:16.

After resting for an hour, McPherson was awakened a little before 11:00 a.m. by Special Agent Trevor Modlin of the Iowa Division of Criminal Investigation. McPherson seemed agitated: he bared his teeth at Agent Modlin when he touched his shoulder to wake him, said several times in a somewhat aggressive manner that he was not all right

---

[2] The video of McPherson in the interview room jumps throughout, cutting a few seconds to up to a minute at a time, including from 9:55:54-9:56:09, 9:59:18-9:59:32, 9:59:48-10:00:02, 10:01:13-10:01:42, and 10:36:53-12:37-14.

and that he needed his prescription medications, and stood up as if to challenge Agent Modlin at one point. Govt. Ex. 1 10:51:29–10:52:30. Agent Modlin stated several times that he wanted to talk to McPherson, and he read him his *Miranda* rights. Govt. Ex. 1 10:51:47, 10:52:11, 10:52:49, 10:53:46. McPherson responded, "Get the fuck out of here and get me a lawyer." Govt. Ex. 1, 10:54:40. Agent Modlin continued to ask McPherson if he would talk to him. Govt. Ex. 1, 10:54:55, 10:55:53, 10:56:13, 10:56:20. After answering a few biographical questions, McPherson stated that he needed a lawyer. Govt. Ex. 1, 10:58:00. Agent Modlin responded, "Here's the thing, we kind of need to figure out what happened." Govt. Ex. 1, 10:58:05. McPherson said that he was ready for a lawyer and that he needed medical attention for his Lou Gehrig's disease, since he had not taken his medications in six hours. Govt. Ex. 1, 10:59:18. Agent Modlin said that he would try to get McPherson his medications and left the room. Govt. Ex. 1, 11:00:00.

McPherson napped in the interview room while he waited for medical attention. Around 12:30 p.m., Special Agent Jacqueline Montagne of the Iowa Division of Criminal Investigation came into the interview room and asked McPherson, who was lying on the ground, "Rough day?" Govt. Ex. 1, 12:36:29. Agent Montagne, who was the case agent for the officer-involved shooting investigation, introduced herself as a law enforcement officer, and McPherson asked whether he was under arrest or being detained (at which point the video skips). Govt. Ex. 1, 12:36:53. When the video picks up again, Agent Montagne said, "I hear what you're saying." It then sounds like McPherson said something about a lawyer, and Agent Montagne responded, "I'm all ears." Govt. Ex. 1, 12:37:14. McPherson then asked if she is his lawyer, and she said that she was checking on him and that an ambulance was coming. Govt. Ex. 1, 12:37:25. There was

3

additional brief conversation, during which McPherson said something about the officer shooting at him, and Agent Montagne told him he was lucky he didn't get shot. After she left the room, McPherson asked another agent who "that lady" was, and the agent explained that Agent Montagne was a police officer. Govt. Ex. 1, 12:40:07. McPherson commented that she seemed nice. Govt. Ex. 1, 12:40:13.

After being allowed to go to the restroom, accompanied by a special agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives, McPherson verbally threatened and made a gesture toward the agent. Govt. Ex. 1, 1:00:10. A scuffle ensued, during which an officer deployed a Taser on McPherson once, and officers subdued him on the ground. Govt. Ex. 1, 1:01:00. An ambulance crew arrived shortly thereafter, and McPherson went to the hospital around 1:00 p.m., accompanied by Sergeant Bluff Police Chief Scott Pack. While at the hospital, a urine sample was taken from McPherson pursuant to a state-court search warrant at the direction of Agent Modlin, who went to the hospital after obtaining the search warrant. Analysis of the urine sample later revealed the presence of benzodiazepines, amphetamines, and THC. *See* Govt. Ex. 3.

After being released from the hospital, McPherson was taken to the Woodbury County Jail around 6:00 p.m. After McPherson had completed the booking process with a Woodbury County correctional officer, Agent Modlin fingerprinted McPherson pursuant to the search warrant, which authorized the collection of "major case prints." Around 7:20 p.m., while Agent Modlin was still taking fingerprints, Agent Montagne came to the doorway of the booking room. She said, "Hi John, remember me?" Govt. Ex. 1, 19:20:20. McPherson asked if she remembered him, to which she responded yes, from him lying on the floor. Govt. Ex. 2, 19:20:34. McPherson asked, "Where? At my house?" Govt. Ex. 2, 19:20:40. McPherson then said he needed a thousand dollars from the bank and needed Agent Montage to retrieve his debit card from his personal effects

4

and use it to obtain the money he needed to post bond. Govt. Ex. 2, 19:20:50. Agent Montagne responded that he had her confused with somebody else. Govt. Ex. 2, 19:21:12. McPherson then said that he had seen Agent Montagne on Facebook, after which Agent Modlin said (as a joke, according to his testimony, as Agent Montagne does not use Facebook) that Agent Montagne was "a big Facebooker." Govt. Ex. 2, 19:21:15. Laughing, Agent Montagne agreed. McPherson asked why she had not gone on a motorcycle ride with him. Govt. Ex. 2, 19:21:31. Agent Montagne responded that she was too scared. Govt. Ex. 2, 19:21:34. McPherson again asked Agent Montagne about his debit card and posting bond, and she walked closer to him. Govt. Ex. 2, 19:21:57. He said that he wanted to talk, and Agent Montagne said that she would love to hear his side of the story. McPherson again said that he wanted to talk, and Agent Montagne said that she would get an interview room.

Once Modlin's fingerprinting process was complete, McPherson was given food and taken to an interview room with Agent Montagne and Chief Pack. *See* Def. Ex. D. Throughout the interview, McPherson referred to Agent Montagne as "Jackie" (her first name)[3] and Chief Pack as "Brad" (his first name is Scott). At the beginning of the interview, McPherson stated that he had "blacked out" earlier at the police department from post-traumatic stress disorder. Agent Montagne asked McPherson how he had been, and he expounded on some recent troubles. Agent Montagne then asked about his parents. After responding to her questions, McPherson asked why she was "doing a biography about [him]." McPherson told Agent Montagne that she had been to his house (which she denied) and that they were Facebook friends (which she did not deny). He

---

[3] Near the end of the interview, McPherson asked how he knew Agent Montagne's name when she walked into the booking room, and when Agent Montagne explained that he had met her earlier in the day, McPherson acted as if he had not remembered, stating that he had believed she was "Jackie Johnson," a woman from his past whom he had known a long time ago.. Def. Ex. C 1:10:20–1:11:20.

5

asked whether Agent Montagne and Chief Pack were romantically involved, and Chief Pack said they were not. McPherson asked again about his debit card and obtaining money for bond, and Chief Pack said they would get it figured out "[o]nce we get done with this." McPherson then asked whether he would be made a confidential informant. When this was denied, he asked, "What are you guys trying to do? . . . What's going on?" Agent Montagne said that they "just want[ed] to get your side of the story about what happened today." McPherson proceeded to talk about the events of the day and to make other incriminating statements. At no point did Agent Montagne and Chief Pack readvise McPherson of his *Miranda* rights or mention McPherson's right to counsel in any way. Neither did they reintroduce themselves as police officers, nor clarify the purpose of the interview.

McPherson moves to suppress the statements made during the interview with Agent Montagne and Chief Pack (Docs. 42, 52). The government resists (Docs. 45, 53). I held a hearing on the motion on August 30, 2017 (Doc. 54-3), at which three witnesses testified on behalf of the government: Agent Montagne, Agent Modlin, and Aaron Girard, a correctional officer at the Woodbury County Jail who was present in the booking room while McPherson was being fingerprinted. The government submitted, and I admitted, Exhibits 1, 2, and 3 into evidence (Doc. 46), and the defendant submitted, and I admitted, Exhibits A, B, C, and D into evidence (Docs. 42-1–42-5).

## II.  DISCUSSION

Under *Miranda*, 384 U.S. at 479, a suspect subject to custodial interrogation must first be advised that he has the right to remain silent and the right to an attorney, and he must waive these rights before the interrogation can proceed. "After the [*Miranda*] warnings are given, . . . . if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present." *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010).

Once the suspect invokes his right to counsel, "a valid [*Miranda*] waiver . . . cannot be established by showing only that [the suspect] responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). Thus, "having expressed his desire to deal with the police only through counsel, [the accused] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id*. at 484-85.

Importantly, "'initiation' of a conversation . . . by an accused" does not automatically "suffice[] to show a waiver of the previously asserted right to counsel"; the *Edwards* initiation inquiry and the *Miranda* waiver inquiry "are separate, and clarity of application is not gained by melding them together." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (plurality opinion); *see also id*. at 1055 n.2 (Marshall, J., dissenting) ("If an accused has himself initiated further communication with the police, it is still necessary to establish as a separate matter the existence of a knowing and intelligent waiver . . . .").[4] In other words, "even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Id*. at 1044 (plurality opinion).

Here, the parties agree that McPherson invoked his right to counsel and that the interview at the Woodbury County Jail constituted a custodial interrogation. They dispute whether McPherson initiated the conversation and whether he validly waived his *Miranda* rights.

---

[4] The four-justice dissent in *Bradshaw* further clarified that "[t]he *only* dispute between the [four-justice] plurality and the dissent in this case concerns the meaning of 'initiation.'" 462 U.S. at 1055 n.2.

### A. *Initiation*

A defendant initiates a conversation under *Edwards* when he asks a question or makes a statement that "evince[s] a willingness and a desire for a generalized discussion about the investigation." *Lamp v. Farrier*, 763 F.2d 994, 997 & n.6 (8th Cir. 1985) (quoting *Bradshaw*, 462 U.S. at 1045) (also recognizing that the *Bradshaw* dissent "wrote in terms of communication initiated by the accused '*about the subject matter of the criminal investigation*'" (quoting 462 U.S. at 1054 (Marshall, J., dissenting))). In other words, "the communication initiated by the accused satisfies *Edwards* only if it relates to the investigation." *United States v. Valdez*, 146 F.3d 547, 551 (8th Cir. 1998). "[I]nquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*." *Bradshaw*, 462 U.S. at 1045 (plurality opinion). For example, inquiries "such as a request for a drink of water or a request to use a telephone . . . are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Id.*

Here, the government argues that McPherson initiated further conversation when he told Agent Montagne that he wanted to talk. McPherson argues that Agent Montagne had previously initiated conversation by asking if he remembered her and that in any event, his statement about wanting to talk did not relate to the investigation.

Whether Agent Montagne initiated further communication when she asked McPherson, "Remember me?" is a close call, and the parties have cited (and I have found) no case directly on point.[5] The Eighth Circuit has held that the officer did not

---

[5] The case relied on by McPherson, *United States v. Whaley*, 13 F.3d 963, 964, 968 (6th Cir. 1994), involved similar facts—the officer said, "I know you," to the defendant in a holding area, which prompted the defendant to say he wanted to talk about his arrest—but the Sixth Circuit declined to address whether this exchange amounted to initiation, noting that the issue was close

8

initiate communication for purposes of *Edwards* by asking the defendant (while driving the defendant to a different jail) whether he had been able to reach his wife on the telephone the night before, *see United States v. Barbarena-Jimenez*, No. 95-3202, 1996 WL 83002, at *4 (8th Cir. 1996) (per curiam) (no precedential value under Eighth Circuit Local Rule 32.1A); by informing the defendant of the results of a lineup identification, *see United States v. Allen*, 247 F.3d 741, 765-66 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002); by telling the defendant a search warrant had been obtained, *United States v. Hull*, 419 F.3d 762, 765-67 (8th Cir. 2005);[6] or by showing the defendant bags of cocaine during the execution of a search warrant and asking what it was, *see United States v. Sanko*, 787 F.2d 1249, 1250-51 (8th Cir. 1986); *see also United States v. Packer*, 730 F.2d 1151, 1153, 1157 (8th Cir. 1984) (recognizing officer initiated further communication when the defendant invoked his right to counsel, and the officer asked defendant to accompany him inside his trailer being searched to ensure no hazardous or explosive materials were inside, where the defendant made incriminating statements).

Here, it seems relevant that Agent Montagne had no reason[7] to be in the booking

---

because the defendant "only spoke after [the officer] acknowledged him."

[6] In *Hull* and *Allen,* the court did not specifically address whether the officer initiated conversation for purposes of *Edwards* after the defendant invoked his right to counsel; rather, the court addressed whether the officers' statements amounted to an interrogation such that the protections of *Miranda* apply. *Hull*, 419 F.3d at 766-68; *Allen*, 247 F.3d at 764-66. In both cases, the court held that the officer's statements were not an interrogation and that the defendant's later statements thus initiated further communication for purposes of *Edwards*. *Hull*, 419 F.3d at 767-68; *Allen*, 247 F.3d at 765-66; *but see Allen*, 247 F.3d at 795-97 (Arnold, J., dissenting).

[7] Agent Montagne testified that she stopped at the jail as part of her role as case agent in the officer-involved shooting investigation to check on the other officers. While I credit this testimony, it does not appear from the video that she made such an inquiry with Agent Modlin when she stopped by the booking room.

room other than to check on McPherson. In cases in which the officers visited the defendant in jail without being summoned in some way by the defendant, courts have held that the officers, and not the defendant, initiated further communication. *See Edwards*, 451 U.S. at 479, 487 (defendant did not initiate conversation when he told police he was willing to talk if shown a third party's taped confession, but only after the police came to visit him in jail, and the guards told him he had to talk to them when he first declined); *cf. Owens v. Bowersox*, 290 F.3d 960, 962-63 (8th Cir. 2002) (affirming on habeas review that the defendant initiated conversation by telling his mother that he wanted to speak to police, prompting the police to visit the defendant in jail after hearing from his mother that he wanted to talk). Of course, McPherson was not in a jail cell, he was in a booking room with other officers and occasionally speaking to them, so the comparison is not directly on point.

I am ultimately persuaded that Agent Montagne initiated further communication with McPherson after considering the entirety of her interaction with him at the jail and all the officers' statements to McPherson throughout the day. This is not a case in which the officers stopped questioning McPherson after he invoked his right to counsel, only for McPherson to later say he wanted to talk to the officers. *Cf. United States v. Palega*, 556 F.3d 709, 715-16 (8th Cir. 2009). Although McPherson immediately invoked his right to counsel in the interview room at the Sergeant Bluff Police Department, when Agent Modlin arrived, he read McPherson his *Miranda* rights and attempted to question him at Agent Montagne's direction.[8] Indeed, despite Agent Modlin being aware that McPherson had previously asked for a lawyer and McPherson repeatedly telling Agent

---

[8] It is unclear when (pre- or post-invocation) Agent Montagne directed Agent Modlin to interview McPherson and whether she knew that McPherson had invoked the right to counsel. Agent Modlin, according to his testimony, was aware that McPherson had requested a lawyer prior to his attempted interview, although he was not clear whether McPherson had been formally advised of his *Miranda* warnings (although it is unclear why that would matter).

Modlin that he wanted a lawyer, Agent Modlin continued to prod McPherson to speak to him, at one point responding directly to a request for counsel by saying, "Here's the thing, we kind of need to figure out what happened." And when Agent Montagne first met McPherson around 12:30 p.m., when he was lying on the floor of the interview room waiting to be taken to the hospital, she asked, "Rough day?" That question could have elicited a response about the events earlier in the day that Agent Montagne was investigating. Considering these facts puts Agent Montagne's question in the booking room—Remember me?—in a new light. The purpose of the *Edwards* rule is to ensure police do not "repeatedly attempt[] to question a suspect . . . until . . . 'badgered into submission.'" *Shatzer*, 559 U.S. at 105 (quoting *Arizona v. Roberson*, 486 U.S. 675, 690 (1988) (Kennedy, J., dissenting)). Here, although Agent Montagne may not have been consciously trying to gather information relevant to the investigation, the end result is that her statement led to McPherson volunteering to talk; it was not on his own initiative. Agent Montagne's statement was "not merely a necessary inquiry arising out of the incidents of the custodial relationship" such that it was clearly allowed under *Edwards*. *Pittman v. Black*, 764 F.2d 545, 547 (8th Cir. 1985) (quoting *Bradshaw*, 462 U.S. at 1046). Rather, both at the interview room in the afternoon and at the booking room in the evening, Agent Montagne inserted herself into the room and asked McPherson a question. Perhaps the questions were innocent small talk, but they also could have elicited statements about the events of the day that officers were investigating.

Even if Agent Montagne saying, "Remember me?" does not rise to the level of initiation under *Edwards*, McPherson did not initiate the communication about the investigation in the booking room at the jail. The Eighth Circuit has held several times that a defendant saying that he wants to speak to an officer constitutes initiation. *See Palega*, 556 F.3d at 715-16; *Hull*, 419 F.3d at 766-68; *Valdez*, 146 F.3d at 550-51.[9] But

---

[9] Other examples of a defendant initiating conversation include volunteering information

in those cases, all previous communication between the defendant and officers related to the investigation, and no officer had spoken to the defendant after his invocation, or at least, no officer had spoken to the defendant for some time before the defendant said he wanted to talk. *See Palega*, 556 F.3d at 715 (thirty minutes of silence elapsed before defendant asked to speak to officer); *Hull*, 419 F.3d at 766, 768 ("[a] few minutes" of silence passed before defendant requested to speak to officer, and the court relied on this fact in determining defendant initiated communication); *Valdez*, 146 F.3d at 550-51 (officers stopped speaking to defendant when he requested counsel and began to leave the room, but a few moments later, defendant said he had changed his mind and wanted to talk). Here, McPherson said that he wanted to talk during the course of a conversation begun by Agent Montagne. He first asked Agent Montage about using his debit card to procure money for bond. McPherson also brought up seeing Agent Montagne on Facebook and her refusing his offer to go on a motorcycle ride before again bringing the conversation back to his debit card. Thus, when he said that he wanted to talk to Agent Montagne, he did not "evince a willingness and a desire" to discuss the investigation—it seems far more likely that he wanted to talk about obtaining the money he needed to post bond or taking Agent Montagne out for a motorcycle ride. McPherson's comments in the interview room reinforce that he did not seek to initiate conversation about the investigation—in the interview room, he again mentioned seeing Agent Montagne on Facebook and asked about his debit card, and he also asked if Agent Montagne and Chief Pack were dating. McPherson did not start speaking about the events of the day until Agent Montagne said that they wanted to get his side of the story about what happened

---

"without any prompting from the agents," *United States v. Lame*, 716 F.2d 515, 521 (8th Cir. 1983); and asking whether others are trying to pin the blame on him, *Pittman*, 764 F.2d at 546-47 (habeas review). Also, in *Bradshaw*, four justices held that the defendant asking, "What is going to happen to me now?" initiated conversation, while four justices held that it did not (the ninth justice would not have addressed initiation and waiver as separate inquiries). 462 U.S. at 1045-46, 1049-51, 1055-56.

that day. Although what constitutes initiation for purposes of *Edwards* may be unclear, ultimately, after considering all the communication between Agent Montagne and McPherson, here, it seems relatively straightforward that Agent Montagne, not McPherson, initiated the communication related to the investigation. As such, Agent Montagne's and Chief Pack's interrogation of McPherson violated his Fifth Amendment rights under *Edwards*, and McPherson's statements should be suppressed from being introduced as substantive evidence in the prosecution's case-in-chief. *See Michigan v. Harvey*, 494 U.S. 344, 345-46 (1990) (holding that the prosecution may use statements "secured pursuant to police-initiated conversation . . . . to impeach a defendant's false or inconsistent testimony").

### B. Miranda Waiver

Even if McPherson initiated further communication with Agent Montagne for purposes of *Edwards*, he did not validly waive his *Miranda* rights. A valid *Miranda* waiver must be knowing, intelligent, and voluntarily. *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011). For a *Miranda* waiver to be voluntary, it must be "the product of a free and deliberate choice[,] rather than intimidation, coercion, or deception." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986). For a waiver to be knowing and intelligent, "the suspect must have waived his rights 'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting *Moran*, 472 U.S. at 421). When the defendant initiates conversation with police after previously invoking the right to counsel, "whether a valid waiver of the right to counsel and the right to silence ha[s] occurred" is considered "*under the totality of the circumstances*, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Bradshaw*, 462 U.S. at 1045 (quoting *Edwards*, 451 U.S. at 486 n.9). The government bears the burden of proof to show waiver by a

13

preponderance of the evidence. *See Bradshaw*, 462 U.S. at 1044; *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Agent Montagne and Chief Pack interrogated McPherson a little before 8:00 p.m. They did not reread him his *Miranda* rights, which had previously been read to him by Agent Modlin about nine hours earlier, after which McPherson had repeatedly invoked his right to counsel while Agent Modlin attempted to talk to him. Neither did Agent Montagne and Chief Pack reintroduce themselves as police officers, even though McPherson suggested he did not remember the events that took place in the police station earlier in the day. It seems that McPherson was likely aware Agent Montagne and Chief Pack were police officers, however, as he asked if they wanted him to be a confidential informant (but also insisted that he knew Agent Montagne and that she had been to his house before). The officers did not mention that McPherson had previously invoked his right to counsel or take any steps to ensure he wished to proceed without counsel.

The government has not proven that McPherson's waiver of his previously invoked right to counsel was knowing and intelligent. This is not a case in which a short amount of time passed between the reading of the *Miranda* rights and the defendant's reinitiation of communication, such that the defendant would not have "forget[ten] the rights of which he had been advised and which he had understood moments before." *Pittman*, 764 F.2d at 546-47 (quoting *Wyrick v. Fields*, 459 U.S. 42, 49 (1982)) (habeas review) (officers obtained a valid *Miranda* waiver from defendant, interrogated him, and ceased questioning when he invoked the right to counsel, and defendant reinitiated further communication before officers could leave the room); *see also Valdez*, 146 F.3d at 551 (same); *United States v. Lame*, 716 F.2d 515, 521 (8th Cir. 1983) (same); *Hull*, 419 F.3d at 766-67 (only a few minutes passed between the defendant invoking the right to counsel after being read his *Miranda* rights and the defendant reinitiating conversation). In cases where, like here, a considerable amount of time passed between the defendant being read

14

his *Miranda* rights and reinitiating conversation, courts have found waiver based on officers readvising the defendant of his *Miranda* rights or reminding the defendant of his previous request for counsel. *See, e.g.*, *Bradshaw*, 462 U.S. at 1042, 1046, 1051 (when defendant initiated conversation "[s]ometime later" in the day, the court found waiver when the officer advised defendant that he did not have to talk to him and that he had previously requested an attorney); *Palega*, 556 F.3d at 715-16 (when defendant initiated conversation thirty minutes after being read his *Miranda* rights and invoking the right to counsel, the court found waiver based on the officer readvising the defendant of his *Miranda* rights and obtaining a signed waiver before reinterrogating the defendant); *Allen*, 247 F.3d at 766 (when defendant initiated communication hours after being read his *Miranda* rights and invoking the right to counsel, the court emphasized in its waiver discussion that defendant "was reminded of his request for counsel and given another explanation of his Fifth Amendment rights just prior to his confession"); *McCree v. Housewright*, 689 F.2d 797, 799, 802 & n.7 (8th Cir. 1982) (habeas review) (when officer spoke with defendant eight to ten hours after he had invoked his right to counsel, the court found waiver when the officer readvised defendant of his *Miranda* rights and reminded him of his previous request for counsel).

The government makes much of the fact that McPherson seemed to have some experience with his rights under *Miranda*: McPherson referred to his *Miranda* rights by name and debated whether they needed to be read to him in conversation with Deputy Peterson. In his debate with Deputy Peterson, McPherson suggested *Miranda* applied only if he was under arrest, and he seemed concerned throughout the day whether he was under arrest or merely detained. Although McPherson's experience with *Miranda* is a relevant consideration, *see, e.g.*, *Lamp*, 763 F.2d at 998, here, it is not sufficient to demonstrate that McPherson understood his rights. What ultimately tips the balance against a finding of waiver is that the officers did not "scrupulously honor[] . . .

15

[McPherson's] invocation of the right to counsel by not interrogating him after he invoked [this] right[]." *Allen*, 247 F.3d at 766. Although McPherson had some understanding of his *Miranda* rights, that understanding might have been hindered by Officer Modlin repeatedly asking him to talk despite his request for an attorney. The advisement of his *Miranda* rights eight hours earlier, when McPherson both invoked the right to counsel and had that right violated, cannot be found sufficient to demonstrate a knowledge and waiver of McPherson's *Miranda* rights during the interrogation with Agent Montagne and Chief Pack. Accordingly, I recommend that McPherson's statements be suppressed from the prosecution's case-in-chief even if the district court finds that McPherson initiated further communication.[10]

### III. CONCLUSION

I respectfully recommend that the district court **grant** McPherson's motion to suppress (Doc. 42) and prevent the government from using McPherson's statements as substantive evidence in its case-in-chief.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. LCrR 59. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming

---

[10] Although I find McPherson's interaction with Agent Modlin earlier in the day relevant to the issue of waiver, I decline to address McPherson's alternative argument that the statements he made to Agent Montagne and Chief Pack should be suppressed as fruits of Agent Modlin's unlawful questioning.

the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DATED AND ENTERED** this 19th day of September, 2017.

_____
Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa